UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
BEVERLY EDWARDS, et al.,

Plaintiffs,

-against- 09 Civ. 4968 (LAK)

PUBLISHERS CIRCULATION FULFILLMENT, INC.,

Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION**

Appearances:

Robert I. Harwood
Peter W. Overs, Jr.
HARWOOD FEFFER LLP

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.

Shannon Liss-Riordan
Harold L. Lichten
Hillary Schwab
PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.
*Attorneys for Plaintiffs.*

Gregory I. Rasin
Elise M. Bloom
Joshua F. Alloy
Mark W. Batten
PROSKAUER ROSE LLP
*Attorneys for Defendant Publishers Circulation Fulfillment, Inc.*

LEWIS A. KAPLAN, *District Judge.*

This is an action by present and former drivers who delivered newspapers for defendant Publishers Circulation Fulfillment, Inc. ("PCF") under their respective Indepdendent Contractor Agreements ("ICAs") with PCF. It seeks to recover (1) deductions from their compensation that allegedly violated Article 6 of the New York Labor Law, (2) amounts that plaintiffs allegedly were required to pay in violation of Section 193(2) of the Labor Law, and (3) damages under Section 198 and Article 19 of the Labor Law. All claims for relief depend upon plaintiffs' overall accusation that PCF wrongly classified them as independent contractors rather than employees. The matter is before the Court on plaintiffs' motion for class certification.

I

Rule 23(a) requires proof of four elements: (1) numerosity, (2) the presence of common issues, (3) typicality, and (4) that plaintiffs and their counsel would adequately represent the class.[1] Where, as here, the principal relief sought is money damages, Rule 23(b)(3) requires that the plaintiffs establish also that "the questions of law or fact common to class members predominate over any questions affecting only individual members ('predominance'), and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy ('superiority')."[2] Before certifying a class, a district court is obliged to conduct a "rigorous

---

1 FED. R. CIV. P. 23.

2 *Brown v. Am. Honda (In re New Motor Vehicles Canadian Exp. Antitrust Litig.,),* 522 F.3d 6, 18 (1st Cir. 2008).

analysis" to determine whether the plaintiffs have satisfied all of the requirements.[3] The burden of demonstrating their satisfaction by a preponderance of the evidence, moreover, rests with the moving party.[4]

II

In this case, there is no dispute that the proposed class is sufficiently numerous and that plaintiffs' counsel would represent the class adequately. The bones of contention are whether the question whether the members of the alleged class were misclassified as independent contractors rather than as employees is common or, in other words, susceptible of proof by classwide evidence and the closely related questions whether common issues predominate and whether plaintiffs' claims are typical of those of the class as a whole. To prevail on the issue of predominance, plaintiffs must show "that those issues in the proposed action that are subject to generalized proof outweigh those issues that are subject to individualized proof."[5] To prevail on the typicality issue, they must show that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."[6]

---

3 *In re Initial Pub. Offerings Secur. Litig. ("In re IPO")*, 471 F.3d 24, 41 (2d Cir. 2006); *In re Parmalat Sec. Litig.,* Master Docket No. 04 MD 1653(LAK), 2008 WL 3895539, at *2 (S.D.N.Y. Aug. 21, 2008).

4 *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

5 *In re Solomon Analyst Metromedia Litig.*, 544 F.3d 474, 480 (2d Cir. 2008) (quoting *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 226 (2d Cir. 2006)).

6 *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)).

In an effort to carry their burden, plaintiffs rely heavily on the form ICA, which they claim all PCF deliverers are required to sign, and certain PCF training materials. Together, they argue, these establish that PCF has reserved the right to control the manner in which the deliverers perform their task, thus making them employees rather than independent contractors, and that employee status therefore may be proved on a classwide basis by this common evidence. There are two problems with this argument.

First, plaintiffs' contention that common proof of a reserved right to control the deliverers, as opposed to proof of whether PCF, in fact, controlled them would be sufficient to establish their employment status rests on a misreading of the pertinent authorities.

Second, even assuming that the employee/independent contractor classification turns on whether PCF had the right to control the deliverers, as opposed to having exercised such control in fact, the evidence does not support plaintiffs' claim that the classification issue is subject to common proof.

III

Plaintiffs argue that "the critical determinant [in evaluating employment status] is the 'existence of the right to control over the agent in respect of the manner in which his work is done.'"[7] To be sure, our Circuit in *Chaiken* used the quoted language in determining that a journalist who wrote for the *Village Voice* from time to time on a per article basis was an independent contractor rather than an employee for purposes of deciding that the *Village Voice* was not liable on

---

7 Pl. Mem. 18 (quoting *Chaiken v. VW Publ'g Corp.,* 119 F.3d 1018, 1033 (2d Cir. 1997), in turn quoting *In re Morton,* 284 N.Y. 167, 172 (1940)) (internal quotation marks omitted).

a *respondeat superior* basis for a defamatory statement in one of the journalist's pieces. But *Chaiken* is not the last word on the subject.

This case is governed by state law, and it is the decisions of the New York Court of Appeals that ultimately control the analysis. In *Bynog v. Cipriani Group, Inc.,*[8] a case decided six years after *Chaiken,* that court reversed a determination that banquet waiters at Cipriani-owned catering facilities were "employees" for purposes of the New York Labor Law. In the course of doing so, they conspicuously did not apply the "right to control" formulation used by the Second Circuit in *Chaiken.* It stated:

> "Article 6 of the Labor Law governs employers' payment of wages and benefits to employees. The parties agree that the critical inquiry in determining whether an employment relationship exists pertains *to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results* (*see Matter of Ted Is Back Corp. [Roberts],* 64 N.Y.2d 725, 726, 485 N.Y.S.2d 742, 475 N.E.2d 113 [1984]; *Matter of 12 Cornelia St. [Ross],* 56 N.Y.2d 895, 897, 453 N.Y.S.2d 402, 438 N.E.2d 1117 [1982]; *see also Matter of Morton,* 284 N.Y. 167, 30 N.E.2d 369 [1940] ). Factors relevant to assessing control include whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule (*see Lazo v. Mak's Trading Co.,* 84 N.Y.2d 896, 897, 620 N.Y.S.2d 794, 644 N.E.2d 1350 [1994] [applying standard in tort context]; *see also Bhanti v. Brookhaven Mem. Hosp. Med. Ctr.,* 260 A.D.2d 334, 335, 687 N.Y.S.2d 667 [2d Dept.1999] )."[9]

Thus, the critical determinant is the degree to which the purported employer exercises control in fact over the results produced or the means used to obtain them. Accordingly, while forms of agreement and other standardized documents surely are pertinent to the analysis, they are not necessarily dispositive of what, ultimately, would be an individualized determination of the degree of control

---

8 1 N.Y.3d 193 (2003).

9 *Id.* at 198 (emphasis added).

that PCF actually exercised over each of the putative class members. A reliance even on unambiguous documents arguably would be insufficient to establish the requisite control in the face of contradictory evidence. Hence, plaintiffs' effort to avoid consideration of what actually occurred with each putative class member by reference to the form ICA and the training materials is insufficient to show that there are common issues, that they predominate, or that the named plaintiffs' claims are typical of the putative class members.[10]

---

10

*See also Connor v. Pier Sixty, LLC,* 23 Misc.3d 435, 437, 870 N.Y.S.2d 899, 901 (Sup. Ct. N.Y. Co. 2009) ("extent of [required] control [to classify as an employee] is a matter which should be explored in discovery and is not an issue which is amenable to a motion to dismiss for failure to state a cause of action").

In arguing for certification, plaintiffs point to a number of cases where courts granted class certification based on documents demonstrating "standardized documents and practices." *See* Pl Br. at 16-21. The cited cases, however, easily are distinguishable.

First, most of the cited cases predate the Second Circuit's 2006 decision in *In re IPO*, 471 F.3d 24 (2d Cir. 2006), which required, *inter alia*, that district judges (1) determine that each Rule 23 requirement has been met and (2) resolve all factual disputes necessary to do so before certifying a class. *See*, *e.g.*, *Torres v. Gristede's Operating Corp.*, No. 04 Civ. 3316 (PAC), 2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006); *Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330 (S.D.N.Y. 2004); *Maneely v. City of Newburgh*, 208 F.R.D. 69 (S.D.N.Y. 2002); *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144 (S.D.N.Y. 2002); *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81 (S.D.N.Y. 2001); *D'Alauro v. GC Serv's Ltd. P'ship*, 168 F.R.D. 451 (E.D.N.Y. 1996). In consequence, plaintiffs' authorities are of limited precedential value in this case as they were decided under a different – and generally less restrictive – standard which, among other things, required district courts to accept the plaintiff's factual allegations as true. *See*, *e.g.*, *Torres*, 2006 WL 2819730, at *8 (accepting plaintiff's factual allegations as true on class certification motion); *Noble*, 224 F.R.D. at 337 (same); *Ansoumana*, 201 F.R.D. at 85 (same); *Maneely*, 208 F.R.D. at 72 (same); *D'Alauro*, 168 F.R.D. at 454 (same).

Second, many of the post-*In re IPO* cases cited by plaintiffs were far more suitable for class certification than is the case here, as a few examples illustrate. In *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152 (S.D.N.Y. 2008), the plaintiffs alleged that the defendant misclassified employees as "exempt" from the overtime requirements of the New York Labor Law. The district court certified the class based on the defendant's concession that its relevant business practices were uniform across the class, that the employee's duties were set forth in a single job description document, that a single set of "protocols" applied to all putative class members, and that a single "Rules Handbook" governed employee behavior. *Id.* at 159. Similarly, in *Niemiec v. Ann Bendick Realty*, No. 04 Civ. 0897

IV

Plaintiffs' would be unable to establish the necessary Rule 23 elements even if, contrary to New York law, it would be sufficient to show that PCF had reserved a "right of control over the [deliverers'] in respect of the manner in which [their] work is to be done."[11]

---

(ENV)(KAM), 2007 WL 5157027 (E.D.N.Y. 2008), the court relied on uncontradicted declarations that the named plaintiffs performed "manual" rather than "supervisory" work in certifying a class based on misclassification under the New York Labor Law. *Id.* at * 10. Finally, in *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418 (S.D.N.Y. 2009), the plaintiff sought certification based on Best Buy's alleged failure to disclose a secret company-wide policy that contradicted its public, uniform, price match guarantee.

Finally, the defendants in the cited cases typically objected to class certification based on differences among class members related to damages – i.e., differences in days or hours the plaintiffs' worked, their tasks, or their pay. *See*, *e.g.*, *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 371 (S.D.N.Y. 2007). Here, by contrast, the relevant difference between putative class members is the amount of control that PCF actually exercised (or, according to plaintiffs' reading of the law, reserved) over the deliverers. This issues bears directly on PCF's liability, not on damages only. For the reasons enumerated below, plaintiffs have failed to persuade the Court that such issues could be resolved by common evidence.

[11] Rule 23 does not require an evidentiary hearing on the issues of class certification. *Marcera v. Chinlund*, 565 F.2d 253, 255 (2d Cir. 1977); *see also* FED. R. CIV. P. 23; 7AA CHARLES ALAN WIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 1785 (2005). Indeed, district courts have "considerable discretion to limit both discovery and the extent of the hearing on Rule 23 requirements." *In re IPO*, 471 F.3d at 41. The only requirement is that they "receive enough evidence, by affidavits, documents, or testimony" to make the necessary determinations. *Id.*

The right to an evidentiary hearing, moreover, may be waived if not requested by the parties. *See Teamsters Local 445 Freight Div. Pension Fund*, 546 F.3d at 203-04 (noting, in opinion affirming denial of class certification, that parties did not request an evidentiary hearing and that none was required); *Marcera*, 565 F.2d at 255 ("[A] denial of class action certification should not ordinarily be made without giving the plaintiffs an evidentiary opportunity, *if requested*.") (emphasis added); *see also United States ex rel Drake v. Norden Sys. Inc.*, 375 F.3d 248, 256 (2d Cir. 2004) (defendant's failure to request evidentiary hearing on preliminary injunction waived right to hearing) (citing *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 256 (2d Cir. 1989)). As neither party has requested an evidentiary hearing in this case and, as explained below, the record is sufficient to determine the issues necessary to resolve the class certification motion, the Court declines to hold one here.

In considering whether the evidence demonstrates that PCF had a common policy of reserving the right to control the deliverers, it is important to bear in mind the difference between the intended result of the PCF-deliverer relationship and the means used to accomplish that result. Under New York law, PCF may direct both independent contractors and employees concerning the result to be achieved.[12] It may, however, direct only employees concerning the means used to achieve that result.[13] Consequently, the fact that PCF had common goals for the deliverers would not be a sufficient basis for classifying them as employees. Rather, to prevail on its class certification motion under plaintiffs' reading of the law, they must show, through common proof, that PCF reserved control over the means they used to accomplish those goals. To do so, plaintiffs rely on the form ICA, PCF training materials, and portions of deposition testimony by two named plaintiffs.

*A. The ICA*

Plaintiffs argue that the ICA, among other things:

1. Sets the deliverers' hours

2. Requires them to make deliveries 365 days per year

3. Requires deliveries by specified times

4. Requires that they arrive at the PCF distribution center by a particular time

---

12 *See Chaiken*, 119 F.3d at 1033 ("Under New York law, the distinction between an employee and an independent contractor has been said to rest in the fact that the former 'undertakes to achieve an agreed result and to accept the directions of his employer as to the manner in which the result shall be accomplished,' while the latter 'agrees to achieve a certain result but is not subject to the orders of the employer as to the means which are to be used.'") (quoting *In re Morton*, 284 N.Y. 167, 172 (1940)).

13 *Id.*

5. Prescribes the routes and customers they serve

6. Fixes the numbers of copies of newspapers given to each deliverer by PCF

7. Fixes the fees paid to the deliverers.

These contentions in material degree are misleading, reflect serious distortions of the terms of the ICA, or are unsubstantiated. They are, additionally, largely irrelevant to the analysis.

The form ICA is clear that the intended result of the relationship is to "provid[e] delivery service for various products, including newspapers, magazines, and other printed material, to subscribers and customers" 365 days per year before a designated time each day.[14] Thus, the requirements that a specified number of deliveries be made 365 days a year during specified times to specified locations, merely reflect – in an entirely appropriate and understandable way – the intended results of the PCF-deliverer relationship. It is undisputed that they are the requirements imposed upon PCF by its clients.[15] As these requirements concern the results to be achieved, not the means to accomplish those results, and as PCF may properly dictate its desired results to both employees and independent contractors, they do not affect the deliverers' employment classification.

Plaintiffs' other contentions conflict with the text of the ICA. The assertions that the ICA sets the deliverers' hours and prescribes when they must arrive at the PCF distribution center are inaccurate. The terms of the form ICA do neither. While the form ICA in use prior to March 2009 provided a range of time during which PCF agreed to make publications available each

14 ICA, at D00437, D00441.

15 Daly Decl. ¶ 20.

morning,[16] this language was removed from subsequent forms. Even if the language had not been removed, a promise to make the publications available within a specified period of time does not direct a deliverer's attendance at a particular time, except to the extent that the deliverer must obtain the publications at some point prior to delivering them.[17] Moreover, the form ICA says nothing whatsoever about the fees the deliverers are paid – the spaces for such information are blank.[18]

In consequence, nothing in the form ICA supports a determination that PCF had a common policy of reserving control over the means the deliverers used to complete their tasks.

*B. The Training Materials*

Plaintiff next relies on what it describes as "training and other materials produced by" PCF. The training material, entitled "Becoming a Certified Service Supervisor," apparently contains five modules, two of which plaintiffs have submitted to the Court. One submitted module is called the "Daily Game Plan." The other is called "Communicating with Independent Contractors." Plaintiff contends that these materials show that PCF "carefully control[s] the way papers are delivered"[19] because they instruct distribution supervisors to:

1. have a "game plan" for early morning operations,[20]

---

16 Daly Decl. ¶ 22.

17 *See*, *e.g.*, Overs Decl. Ex. D ("ICA").

18 ICA at D000443.

19 Pl. Br. at 7.

20 Overs Decl. Ex. C at D000192.

2. make a plan for new deliverers, which includes preparing a route list, including subscriber requests on that list, ensuring that labeled papers are in the proper sequence, ordering necessary labels, creating a map of the route[21]

3. show the new deliverer around the distribution center,[22]

4. have a distribution center staff member accompany the deliverer during the first six days of the relationship to demonstrate, among other things, route landmarks, how to throw a paper, and how properly to place a paper,[23]

5. resolve delivery problems, including providing the deliverer with the distribution center phone number and instructions on how to call collect if necessary,[24]

6. contact and keep a record of late deliverers.[25]

Even assuming that these statements in the training material would be sufficient to demonstrate that PCF had a common policy of reserving control over the means by which the purported class members made deliveries, there is no evidence demonstrating that PCF used the training materials in a common manner. The record, in fact, shows just the opposite. There is uncontradicted evidence that the PCF training materials upon which plaintiffs rely never were used

---

21 *Id.* at D000265.

22 *Id.* at D000267.

23 Overs Decl. Ex. C, at D000262, D000267-73.

24 *Id.* at D000272.

25 *Id.* at D000233-35.

prior to 2006 or used in a consistent and common fashion thereafter.[26] It is uncontradicted also that four PCF distribution center managers – Frank Perri, Michael A. Derosario, Howard Rubin, and Michael Gabriel – who manage five of PCF's thirty-one distribution centers in New York, never have seen the training materials.[27] Accordingly, the training materials do not establish that PCF had any common policy of training its employees to act towards deliverers in the manner described in these materials.

Plaintiffs next point to statements in a series of newsletters PCF sent to distribution center managers. They claim that these documents show PCF's common policy of controlling the means of delivery because they directed distribution managers to "find out what you can control and what motivates [the deliverers]" and "instruct[ed] [the managers] to direct newscarriers on how to save fuel costs" in various ways.[28] As with the ICA, plaintiffs' contentions are misleading.

The first statement, in context, is not indicative of any common policy to reserve the right to control the means of delivery, but rather, common courtesy. It advises distribution supervisors that, in times of stress, such as a rainy morning with newspapers arriving late from the publisher, showing appreciation for the deliverers' efforts by, for example, saying good morning or thanking them, might "be the factor that tips the scale" in favor of retaining a deliverer who provides quality service.[29]

---

26 Gunn Decl. at 13.

27 Perri Decl. ¶ 31; Derosorio Decl. ¶ 28; Rubin Decl. ¶ 27; Gabriel Decl. ¶ 29.

28 Pl. Br. at 7, 10.

29 Overs Decl. at D000340.

The second statement is even less indicative of a common policy of reserving the right to control. Rather than instructing distribution managers to "direct" deliverers about ways to save fuel, as plaintiffs claim, the newsletter actually states that distribution managers should "[b]e prepared to offer some ideas on how [the deliverers] might be able to squeeze more miles out of a tank of gas."[30] It then provides some methods that the distribution managers might "consider" using, and notes also that "to the extent that you can sympathize with the [deliverer] and their situation, your understanding will help ease the stress of the dilemma."[31]

There simply is no way to characterize the statements plaintiffs quote as evidence that PCF has a common policy of reserving the right to control the means the deliverers' use to complete their deliveries. This is especially true since, as plaintiffs admit, the deliverers are "required to provide their own vehicles, and pay for all fuel and expenses."[32]

### C. *Plaintiff Testimony*

Plaintiffs' final evidence of an alleged common PCF policy to reserve control of the means of delivery comes from the depositions of two named plaintiffs. They argue that the deliverers were (1) not permitted to make changes to the form ICA before signing,[33] (2) not able to

---

30. *Id.* at D000339.

31. *Id.*

32. Pl. Br. at 10.

33. Overs Decl. Ex. E ("Edwards Dep.") at 47:6-24; Overs Decl. Ex. F ("Deosaran Dep.") at 134:4-135:16.

negotiate the rates in the form ICA,[34] and (3) ordered to arrive at the distribution facility at specified times.[35] These contentions do not help plaintiffs' prove that PCF had a common policy of reserving a right to control the means of delivery because there is no evidence that their experiences were common to the putative class members.

Edwards and Deosaran's testimony is based almost entirely on their own experiences, without any reference to other deliverers.[36] The one exception is Deosaran's testimony that she had asked other people if they had tried to negotiate for more money and was told that they had tried and failed.[37] This statement, however, is contradicted by her immediately preceding answer in which she testified that "I have not heard anybody try to negotiate."[38] Furthermore, her belief that PCF prohibits negotiation of the ICA is contradicted by other evidence. Claudia Garcia, a deliverer who picks up periodicals from the Farmingdale distribution center, renegotiated her contract in 2006 and

---

34 Deosaran Dep. at 46:25-47:25.

35 Edwards Dep. at 12:18-23, 71:22-24, 110:14-23.

36 *See*, *e.g.*, Edwards Dep. at 12:8-23 ("Q. What was the specific problem you were having at the time that you and Michelle discussed? A. I was having problems with one of the managers complainting to me about coming in at a certain time to the depot to do my paper route. . . . Q. What specifically were they saying to you about coming into the depot that you objected to? A. They said that *I* had to be there at a certain time in the morning."); Deosaran Dep. at 46:25 ("Q. Did you try to negotiate prices with Mr. Hightower or anybody else? A. There was no negotiation. . . . They did not give you that opportunity. Q. Did you try? A. No. . . . Q. What makes you think it is non-negotiable? A. Well, to the best of my knowledge, I have not heard anybody try to negotiate. It was a done deal.").

37 Deosaran Dep. at 47:21-25("Q. Have you asked other people if they negotiated their prices? A. I have asked them if they tried, asked them for more money, and they said they tried and that was it, none.").

38 *Id.* at 47:11.

received increased fees.[39] Other deliverers similarly have negotiated the size of their routes.[40]

* * *

Plaintiffs have failed to provide any indication that the employment status of the putative class members could be proved by common evidence. In consequence, an individualized assessment of PCF's relationship with each deliverer would be necessary in order to determine whether he or she had been improperly classified and PCF's liability under the New York Labor Law. Individual issues, therefore, would predominate over common ones for each of plaintiffs' claims. Moreover, nothing indicates that the named plaintiff's claims are typical of the putative class members'.

## V.

Plaintiffs seek also class certification under Rule 23(b)(2) on their claims for a declaratory and injunctive relief. Certification under this provision is proper if the moving party has carried its burden on the the Rule 23(a) requirements and "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."[41] When a request for monetary relief is coupled with a request for declaratory or injunctive relief, the court must determine whether the requested monetary relief predominates over the equitable relief, as

39 Garcia Decl. ¶ 3.

40 Garcia Decl. ¶ 8; Hargrove Decl. ¶ 16; Bolanoz Decl. ¶ 7; Baselice Decl. ¶ 7; Arango Decl. ¶ 7; Valpais Decl. ¶ 7.

41 Fed. R. Civ. P. 23(b)(2).

Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominately to money damages."[42]

Among the factors relevant to determining whether the monetary relief predominates over equitable relief is whether "even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought."[43] Plaintiffs here have not demonstrated that reasonable plaintiffs would bring the suit absent the possibility of a possible monetary recovery. They do not seek to change PCF's conduct[44] or claim that it hires its deliverers in a discriminatory manner.[45] They ask only that this Court declare that the deliverers are employees and not independent contractors. Such a declaration, however, would serve no purpose other than to set the stage for the recovery of money damages under the New York Labor Law. In consequence, the claim for money damages predominates and certification under Rule 23(b)(2) would be inappropriate.

---

42 *Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 18-19 (2d Cir. 2003) (quoting FED. R. CIV. P. 23(b)(2) advisory committee's note (1966)).

43 *Id.* at 20 (quoting *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 164 (2d Cir. 2001)).

44 *See*, *e.g.*, *Jermyn*, 256 F.R.D. at 434 (certifying class to enjoin defendant from using deceptive advertising).

45 *See*, *e.g.*, *Velez v. Novartis Pharms. Corp.*, 244 F.R.D. 243, 271 (S.D.N.Y. 2007).

*Conclusion*

For the foregoing reasons, plaintiffs' motion for class certification [DI 16] is denied.

SO ORDERED.

Dated: June 16, 2010

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)